**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**

| | |
|---|---|
| **UNITED STATES OF AMERICA and THE STATE OF FLORIDA** *ex rel.* **HOLLY TAYLOR,**<br><br>            **Plaintiff-Relator**<br><br>v.<br><br>**DR. ASAD QAMAR and INSTITUTE OF CARDIOVASCULAR EXCELLENCE,**<br><br>            **Defendants.** | **IN CAMERA AND UNDER SEAL**<br><br>**JURY TRIAL DEMANDED** |

**COMPLAINT FOR FALSE CLAIMS ACT VIOLATIONS**
**UNDER 31 U.S.C. § 3729, ET SEQ.**
**AND DEMAND FOR JURY TRIAL**

    1.    This is an action brought on behalf of the United States of America and the State of Florida by Holly Taylor ("Taylor"), by and through her attorneys, against Asad Qamar, MD ("Dr. Qamar") and his medical group, Institute for Cardiovascular Excellence ("ICE"), pursuant to the *qui tam* provisions of the Federal Civil False Claims Act ("FCA"), 31 U.S.C. § 3729, *et seq*, and the Florida False Claims Act ("Florida FCA"), Fla. Stat. §§ 68.081-68.092.

**I.    PRELIMINARY STATEMENT**

    2.    This suit seeks to recover millions of dollars in damages sustained by the Medicare and Medicaid programs ("the Government Programs") as a result of Defendants' fraudulent schemes.

    3.    Dr. Qamar is the founder and principal of ICE, a medical facility in Ocala, Florida. ICE is home to Dr. Qamar's practice and houses two catheterization laboratories ("cath

labs") in which Dr. Qamar and other doctors and staff perform diagnostic and interventional catheterization procedures.

4.      According to paperwork submitted in ICE's name, ICE employees, including Dr. Qamar, perform thousands of cardiovascular diagnostic and interventional procedures every year and bill the Government Programs for the associated services.  In doing so, ICE certifies that it is in compliance with the rules and regulations of Medicare Part B, the chief requirement of which is to serve only patients who have a specific and substantial medical need for the services rendered.

5.      In 2012, Dr. Qamar received $18 million in reimbursements from Medicare, making him the most-reimbursed cardiologist in the United States that year by a factor of 4.  His billings for 2012 put him second on the list of all doctors, nationwide.

6.      Taylor is the former director of client services at Partners in Practice ("PIP"), located in Sarasota, Florida, which has since been succeeded in interest by Origin Healthcare Solutions ("Origin").  Taylor has over 30 years of cardiology experience including 15 years in clinical research and 15 years in practice management, which includes medical billing.

7.      At PIP, Taylor was assigned as the account manager for Dr. Qamar and ICE and was tasked with reviewing their Medicare billings. Based on first-hand observations while working onsite in Dr. Qamar's multiple offices, her conversations with Dr. Qamar and his staff, and her review of related documents, Taylor alleges that, from 2008 to 2011, Dr. Qamar and ICE defrauded the United States and the State of Florida of tens of millions of dollars.

8.      Taylor alleges that Dr. Qamar and ICE routinely waive required Medicare copayments and payments on deductibles and regularly provided services to patients who did not

have a medical need for them.  Dr. Qamar and ICE nevertheless billed the Government Programs for the cost of these services.

9.     For example, in or around June 2010, Taylor reviewed a patient's medical record who had died while under Dr. Qamar's care.  The patient had major blockages in her heart (life-threatening) and both legs (non life-threatening).  Dr. Qamar was not qualified to treat the heart blockage.  Instead of immediately referring the patient to a specialist for the heart blockage, he put a stent in one of the patient's legs.  The patient was then scheduled to see Dr. Qamar a second time for a stent placement in the other leg.  Before the patient received treatment for the heart blockage, however, she died of complications from the first stent procedure.

10.    In addition, Taylor alleges Dr. Qamar and ICE regularly billed for procedures that were not performed at all.  Generally, this would be done by "upcoding," a fraudulent scheme whereby a provider instructs billers to code for expensive procedures when, in fact, less expensive procedures are being performed.

11.    Based on Taylor's experiences and the documentation she collected, she alleges Dr. Qamar and ICE committed have committed a massive fraud on the Government Programs and Dr. Qamar is risking the health of his patients.

12.    Dr. Qamar and ICE were not entitled to reimbursement on the false claims they submitted and they owe damages to the United States and the State of Florida as a result.

## II.    JURISDICTION AND VENUE

13.    This Court has subject matter jurisdiction over this action pursuant to 31 U.S.C. §3732(a) and (b), 28 U.S.C. § 1331, and 28 U.S.C. § 1345.

14.    This Court has personal jurisdiction over Dr. Qamar and ICE because, among other things, Defendants transact business in this District, and engaged in wrongdoing in this District.

3

15.     Venue is proper in this District under 31 U.S.C. § 3732(a) and (b), and 28 U.S.C.

§§ 1391(b) and (c).  Defendants transact business within this District, and acts proscribed by 31

U.S.C. § 3729 occurred in this District.

## III.   PARTIES

### A.     PLAINTIFF/RELATOR TAYLOR

16.     Plaintiff/Relator Taylor brings this action on behalf of herself and the United

States pursuant to 31 U.S.C. § 3730(b)(l) and on behalf of herself and the State of Florida

pursuant to the *qui tam* provision of the Florida FCA.  *See* Fla. Stat. § 68.083 (2013).

17.     Taylor has complied with all procedural requirements of 31 U.S.C. § 3730(b)(2)

and Fla. Stat. § 68.083(3).

### B.     DEFENDANT DR. QAMAR

18.     Dr. Qamar is an interventional cardiologist in Ocala, Florida.

### C.     DEFENDANT ICE

19.     ICE is Dr. Qamar's medical group and business entity with four locations in

North Central Florida.

## IV.   THE APPLICABLE STATUTES

### A.     THE FALSE CLAIMS ACT

20.     The FCA is the Federal government's chief weapon in combating waste, fraud,

and abuse of public funds.  In relevant part, it provides for treble damages liability and civil

penalties for any entity which

> (i) knowingly presents, or causes to be presented, a false or
> fraudulent claim for payment or approval, 31 U.S.C. § 3729(a)(1)
> (2000) and, as amended, 31 U.S.C. § 3729(a)(1)(A);
>
> (ii) knowingly makes, uses, or causes to be made or used, a false
> record or statement material to a false or fraudulent claim, id. §
> 3729(a)(1)(B); or

> (iii) conspires to defraud the Government by getting a false or
> fraudulent claim allowed or paid, id. § 3729(a)(3) (1986), and, as
> amended, 31 U.S.C. § 3729(a)(l)(C).

21.     An entity "knowingly" presents or causes to be presented a false statement where it "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." The FCA does not require proof of a specific intent to defraud. 31 U.S.C. § 3729(b)(1).

22.     In addition, the FCA provides that a person "may bring a civil action for a violation of section 3729 for the person and for the United States Government." 31 U.S.C. § 3730(b)(1).

### (i)    Copayment Requirement

23.     Medicare Part B typically pays 80% of a "reasonable charge" for medical services rendered. 42 U.S.C. § 1395l(a)(1). Beneficiaries are expected to make up the remaining 20%.

24.     Requiring beneficiaries to pay for part of the services they receive discourages patients from accepting services they do not need.

25.     When a provider routinely waives Medicare's copayment, they are misstating their charges. See OIG Special Fraud Alert. 59 F.R. 242 (December 19, 1994). The OIG's alert explains:

> If a supplier claims that its charge for a piece of equipment is $100,
> but routinely waives the copayment, the actual charge is $80.
> Medicare should be paying 80 percent of $80 (or $64), rather than
> 80 percent of $100 (or $80). As a result of the supplier's
> misrepresentation, the Medicare program is paying $16 more than
> it should for this item.

Id.

26.     Billing under such a scheme constitutes submission of a false claim under the False Claims Act: "[A] provider . . . who routinely waives Medicare copayments or deductibles is misstating its 'actual charge' and doing so results in false claims. *U.S. ex rel. Sharp v. E. Oklahoma Orthopedic Ctr.*, 2009 WL 499375 at \*23 (N.D. Okla. Feb. 27, 2009) (citing the OIG fraud alert and, on a motion to dismiss, deeming sufficient allegations that routine waiver of co-payments constituted a false claim); *see also Hill v. Morehouse Med. Associates, Inc.*, 2003 WL 22019936 at \*1 n.1, \*2-3 (11th Cir. Aug. 15, 2003) (finding allegations including waiver of copayments had been stated with requisite particularity to make an allegation under the False Claims Act).

### (ii)     Medical Necessity

27.     The Medicare program consists of four parts: Parts A, B, C, and D.  The medical services at issue in this case are covered under Part B.  The fundamental requirement for reimbursement eligibility under Medicare Part B is that the service provided must be reasonable and necessary. *See* 42 U.S.C. § 1395y(a)(1)(A).

28.     "Claims for medically unnecessary treatment are actionable under the FCA." *U.S. ex rel. Riley v. St. Luke's Episcopal Hosp.*, 355 F.3d 370, 376 (5th Cir. 2004) (footnote omitted).

### (iii)     Billing for Services Not Provided

29.     "Upcoding is actionable under the FCA." *U.S. ex rel. Harris v. Bernad*, 275 F. Supp. 2d 1, 6 (D.D.C. 2003) (denying motion to dismiss FCA claim alleging upcoding); *see also Hill v. Morehouse Med. Associates, Inc.*, 02-14429, 2003 WL 22019936 at \*1 n.1, \*2-3 (11th Cir. Aug. 15, 2003) (finding allegations including upcoding had been stated with requisite particularity to make an allegation under the False Claims Act).

**B.      THE FLORIDA FALSE CLAIMS ACT**

30.      Florida's Medicaid equivalent to the FCA similarly prohibits presenting and causing to be presented false claims, making or causing to be made false records material to a false claim, and conspiring to do either. Fla. Stat. §§ 68.082(2)(a) (knowingly presents or causes to be presented a false claim), (2)(b) (knowingly makes or causes to be made or used a false record material to a false claim), (2)(c) (conspiracy).

**V.      THE GOVERNMENT PROGRAMS**

**A.      MEDICARE AND MEDICAID**

31.      The Medicare program was established in 1965 as a medical insurance program for persons age 65 or older, persons under age 65 with certain disabilities, and persons of any age with end-stage renal disease. The United States Department of Health and Human Services administers the Medicare program through a contract with the Centers for Medicare and Medicaid Services.

32.      Medicare now covers approximately 52 million Americans, with total expenditures of approximately $554 billion in fiscal year 2013. This accounts for approximately twenty percent of the federal budget. The program is financed, in part, by a portion of the payroll taxes that are paid by workers and their employers. It is also financed by monthly premiums that are deducted from Social Security checks.

33.      Medicaid is a joint federal-state program created in 1965 that provides health care benefits for certain groups, primarily the poor and disabled. The federal government pays a portion of each state's Medicaid payments. The amount paid by the federal government is known as the Federal Medical Assistance Percentage ("FMAP") and is based on the state's per capita income compared to the national average. *See* 42 U.S.C. § 1396d(b). FMAP is at least fifty percent and is as high as eighty-three percent.

**B.    DR. QAMAR AND ICE'S CERTIFICATIONS TO THE GOVERNMENT PROGRAMS**

34.    In order to participate in Medicare as a group clinic, ICE is required to complete

an application.  As part of the application process, ICE completed the following certification:

> I agree to abide by the Medicare Laws, regulations, and program
> instructions that apply to this supplier.  The Medicare laws,
> regulations and program instructions are available through the
> Medicare contractor.  I understand that payment of a claim by
> Medicare is conditioned upon the claim and the underlying
> transaction complying with such laws, regulations, and program
> instructions (including, but not limited to, the Federal anti-
> kickback statute and the Stark law), and on the supplier's
> compliance with all applicable conditions of participation in
> Medicare…

> …I will not knowingly present or cause to be presented a false or
> fraudulent claim for payment by Medicare, and I will not submit
> claims with deliberate ignorance or reckless disregard of their truth
> or falsity.

See CMS, Form CMS 855B.

35.    Dr. Qamar is required to complete a similar certification for participation in

Medicare as an individual physician.  See CMS, Form CMS 855I.  Both Dr. Qamar and ICE are

required to complete similar certifications for participation in the Medicaid program.

36.    Those submitting insurance claims to the Government Programs also certify that

the services rendered are "medically indicated and necessary for the health of the patient;" that

the information on the claims form is true, accurate and complete; and that the provider

"understand[s] that because payment and satisfaction of the claim will be from Federal and State

funds, and any false statements, documents, or concealment of a material fact are subject to

prosecution under applicable Federal or State laws."  CMS, Form CMS 1500.  Further, Form

1500 contains the following notice: "Any person who knowingly files a statement of claim

containing any misrepresentation or any false, incomplete or misleading information may be guilty of a criminal act punishable under law and may be subject to civil penalties." Id.

37.    Dr. Qamar and ICE made these certifications to the Government Programs at the time of their initial application to become providers and regularly recertify this information as a condition of their continued participation.

## VI.    DR. QAMAR AND ICE'S FRAUDULENT SCHEME

38.    In 2008, Dr. Qamar and ICE retained PIP to be their outside biller.

39.    In April 2010, Taylor transitioned onto the Dr. Qamar/ICE account and learned that ICE was having problems obtaining reimbursement for a number of its services.  Later that month, PIP discovered that Dr. Qamar was under investigation by the Medicare Administrative Contractor ("MAC")  and had been placed in prepayment review with respect to six CPT codes (93510, 75724, 75716, 75650, 36245 and 36215) relating to procedures done in the cath lab.

40.    Prepayment review involves a determination by the MAC whether a claim is worthy of reimbursement *before* payment is made to the submitter.  This is in contrast to Medicare's usual trust-based system that reimburses for services first, and checks for problems later.  Providers are selected for prepayment review if, among other reasons, the MAC has identified questionable billing practices, if it receives alerts from other government agencies, or if it receives complaints from patients.

41.    Given PIP's experience with Medicare billing, the fact that ICE was on prepayment review created cause for concern within their organization.

42.    On April 20, 2010, Taylor and others at PIP met with Dr. Qamar to discuss their concerns and propose a procedure for dealing with the prepayment review.  This was the first time one of PIP's clients had been subject to a prepayment audit.  At the meeting, PIP informed

Dr. Qamar that PIP would not continue to provide billing services unless he agreed to allow them to temporarily assume responsibility for the management of his practice.

43.     PIP did not believe that Dr. Qamar would be able to successfully navigate the pre-payment audit without significant changes to his practice operations. This belief was based largely on the fact that Dr. Qamar did not dictate any of his interventional procedures, office notes or diagnostic imaging and instead relied on his staff to function as scribes. Additionally, Dr. Qamar did not have in place a procedure whereby he would review and approve the notes scribed by his staff.

44.     Unless Dr. Qamar either dictated his own notes or reviewed the notes scribed by others, he could not substantiate the medical necessity of the procedures being performed and/or insure that the appropriate CPT codes were being assigned to the procedures.

45.     At the April 20, 2010 meeting, Dr. Qamar agreed that PIP could temporarily assume management of his practice and also agreed to immediately assume responsibility for personally dictating all interventional procedures. Taylor was assigned by PIP to directly manage Dr. Qamar's practice.

46.     After working on-site at ICE for two months (April through June 2010), Taylor informed her superiors at PIP that she wanted to report Dr. Qamar to federal authorities because he was clearly committing Medicare fraud and performing services that were not medically necessary. Based on Taylor's concerns, PIP stopped managing Dr. Qamar's practice in June 2010, but continued serving as his outside biller.

47.     PIP's general counsel wrote a letter to Dr. Qamar's counsel in July 2010 informing him of the issues internally raised by Taylor. Dr. Qamar was given a 30-day deadline to correct all these issues or PIP would terminate its contract with Dr. Qamar. Additionally, PIP's general

counsel stated that, in the interim, PIP would no longer provide billing services related to the issues set forth in the letter. Dr. Qamar never corrected any of these issues.

48.    In February 2011, Dr. Qamar and ICE stopped using PIP and instead began using an in-house person to bill all of their services.

## A.    ROUTINE WAIVER OF MEDICARE COPAYMENTS AND DEDUCTIBLES

49.    The staff at PIP received a high number of phone calls from Dr. Qamar's patients explaining that they should not have been billed for their copayments.

50.    This is because Dr. Qamar himself routinely told patients that they would not personally have to pay for any of the services he rendered; indeed, Dr. Qamar told patients that their insurance payments would be treated as payment in full.

51.    Not only were copayments waived, but deductibles were not consistently collected for government or private insurance carriers.

52.    PIP would send statements to the patients for the amounts owed, but Dr. Qamar and his staff would tell patients to ignore such statements from PIP, promising that he would not refer the patients to collections. And Dr. Qamar made good on his promise, as he never referred such patients to collections.

53.    Patient balances were also written off for financial hardship at the direction of ICE staff, but the appropriate financial hardship paperwork was never completed

54.    PIP used a software system (GE dataset) to submit bills for Dr. Qamar and ICE. The GE dataset has detailed patient account specific notes made by PIP and ICE staff in the process of managing claims and includes notes documenting patient calls stating they were advised to ignore and not pay co-pays and/or patient statement balances.

55.    Dr. Qamar's routine waiver of Medicare-required copayments and deductibles meant he was submitting 100% of the charges of treatment to the Government Programs, not the 80% contemplated by statute.  On its own, this constitutes a violation of the FCA, but even more troubling is that it led Dr. Qamar to bill for medically unnecessary services, sometimes to the detriment of his patients' health.

## B.    BILLING FOR MEDICALLY UNNECESSARY SERVICES

56.    While Taylor worked on the Dr. Qamar/ICE account, she became aware that Dr. Qamar and ICE regularly would bill for medically unnecessary services.  This was in part due to the fact that Dr. Qamar routinely waived Medicare co-payments so that a patient would not question the high cost of the testing being performed, and also because ICE's billing and documentation policies were deficient and did not properly document necessity for many services performed.

57.    As a result of these problems and likely from the desire to maximize profits, Dr. Qamar and ICE billed for an unrealistically high percentage of expensive procedures, Dr. Qamar would perform unplanned procedures, and was subject to accusations by ICE staff that he was committing fraud.

### (i)    Waiving Copayments Led to the Provision of Medically Unnecessary Services

58.    Because Dr. Qamar and ICE waived patient copayments, patients had no reason to turn down services and would oblige Dr. Qamar's improper recommendation that they consent to all manner of procedures for which there was no medically indicated need.

59.    Copayments are intended to eliminate the moral hazard created when a third party (here, American taxpayers) pays for treatment.

60.     Without this protection, Dr. Qamar and his prospective patients agreed to perform a multitude of unnecessary, and often the most-expensive, diagnostics.

### (ii)    Lacking Documentation of Medical Necessity and Inadequate Office Procedures

61.     The procedures performed at ICE were scribed by various office personnel, not by Dr. Qamar himself, and were scribed in an inconsistent fashion.  In addition, there was no approval process in place by which Dr. Qamar personally reviewed and corroborated documentation produced by scribes who documented on his behalf.

62.     For example, claims submitted for patients undergoing a prothombin time test ("protime test") performed in one of ICE's offices were different from those performed in another office.  At one office, only the protime test was billed while at another office, both a protime test and a Level 2 or 3 E/M visit were billed.

63.     Taylor also witnessed Dr. Qamar and ICE prescribe nuclear stress tests without documentation establishing need.

64.     Dr. Qamar would further conduct erectile dysfunction ultrasounds without any documentation of medical necessity.

65.     Generally, billing practices were inconsistent based on whether a patient was government-insured, privately-insured, or a self-paying patient.

66.     Dr. Qamar's scribe responsible for dictating office visits, Michelle Hamilton, was never present in the exam room while Dr. Qamar would perform patient exams, but would recreate a dictated note from a handwritten documentation of the encounter.  Thus, the visits used to establish the procedures needed were not adequately described.

67.     Further, Dr. Qamar and ICE sometimes would schedule patients for cath lab procedures referred from other cardiologists without first seeing the patient in the office and

without a current history and physical examination or recent lab work. This was in violation of Dr. Qamar's own cath lab policy. Thus, a patient might undergo an invasive procedure without any record of being told about the procedure or examined for its suitability by Dr. Qamar.

68. ICE's front-office policies were also grossly deficient. Telephones would go unanswered at ICE, front-office staff would be given pre-signed, blank prescription pads with which to write patients' requested prescriptions (often resulting in faulty prescription instructions), and there were severe delays in scheduling patient appointments which resulted in clinical implications for some patients. Charts detailing the diagnostic tests performed on a patient were stored in physically separate areas and, as a result, a review of a patient's primary chart would not provide a true account of all patient encounters and diagnostic tests performed.

69. Specifically, separate charts were maintained for the following diagnostics: vascular ultrasound; echo; Coumadin clinic; pacemaker; Holter monitor; and stress test.

70. At one point, a large filing cabinet was found full of loose, non-alphabetized papers that had never been filed into patients' charts, and no effort was made to file these reports into the appropriate charts.

### (iii) Unrealistically High Percentage of Expensive Procedures

71. Taylor noted that Dr. Qamar and ICE performed an unrealistically high percentage of expensive interventional procedures; in particular, peripheral vascular interventions and diagnostic imaging of the renal arteries.

72. Based on the number of patients undergoing peripheral vascular ultrasound diagnostic scans, Taylor would have expected the number of actual interventions to have been significantly lower, but they were not.

73.     The prevalence of peripheral vascular disease in the general population is 5% in patients over age 50, and 20% in patients over age 70. Only a small number of patients with this disease actually require intervention.

74.     Under Dr. Qamar's care, nearly all patients receiving these diagnostic scans also received interventions.

75.     If Dr. Qamar's patient population had a higher rate of peripheral vascular disease than the general population it might be possible to see an increase of up to 10%, but it would be statistically impossible to medically support the number of interventions for which Dr. Qamar and ICE billed for in 2010-11.

76.     Of all procedures covered by Medicare that Dr. Qamar was qualified to perform, these interventions receive the highest reimbursement.

### (iv)    Planning For One Procedure, Receiving Two

77.     When patients were scheduled for a specific cath lab procedure, they would often have additional, unplanned diagnostic imaging performed on them.

78.     Dr. Qamar would sometimes explain he had done so because he was "already in there."

79.     For example, patients would be scheduled for a diagnostic heart cath and end up having diagnostic imaging done on multiple vascular beds.

80.     Similarly, there were high numbers of patients with cardiac symptoms and positive stress tests who were scheduled for heart caths, but during the procedure wound up having renal artery and peripheral vascular imaging and interventions performed.

### (v)    Accusations by Staff

81.    While Taylor worked on the Dr. Qamar/ICE account she had a great deal of interaction with ICE staff and was physically present at ICE's Ocala office intermittently from April to June 2010.

82.    ICE staff told Taylor that Dr. Qamar was performing medically unnecessary services in the cath lab. A staff member specifically told Taylor that when the previous medical director had reviewed films of Dr. Qamar's procedures, the director had chastised Dr. Qamar for performing medically unnecessary procedures.

83.    Tammy Brinkman, RN, was the ICE cath lab director. Nurse Brinkman told Taylor that ICE had a difficult time keeping clinical staff because the "good nurses always leave when they find out what he is doing." Taylor asked what Nurse Brinkman meant by this, and Brinkman stated that Dr. Qamar performed unnecessary procedures. Taylor sought to confirm this, asking, "are you telling me Dr. Qamar is doing unnecessary procedures on patients?" and Nurse Brinkman responded, "yes."

### C.    BILLING FOR SERVICES NOT PROVIDED

84.    In addition to providing medically unnecessary procedures, Dr. Qamar and ICE would sometimes bill for procedures that were not performed at all. Generally, this would be done by "upcoding," a fraudulent scheme whereby a provider instructs billers to code for expensive procedures when, in fact, less expensive procedures are being performed.

### (i)    Specific Patient Examples of Upcoding

85.    The following are three examples where both Dr. Qamar and one of his scribes, Lisa Wills, RN, dictated notes for the very same cath lab procedures. When PIP translated these notes into billing codes, Dr. Qamar's dictations resulted in significantly higher reimbursement payments than Nurse Wills' dictations.

86.    Both Dr. Qamar and Nurse Wills dictated procedures for the same three patients: patient A.T.; patient T.B.; and patient V.F.

87.    For patient A.T., Dr. Qamar's dictations resulted in a $2,293 – or 28% – increase over Ms. Wills' dictations.

88.    For patient T.B., Dr. Qamar's dictations resulted in a $2,987 – or 14% – increase over Nurse Wills' dictations.

89.    For patient V.F., Dr. Qamar's dictations resulted in a $3,182 – or 63% – increase over Nurse Wills' dictations.

90.    With respect to these three patients, the higher reimbursements resulted from Dr. Qamar indicating that he performed a selective catheter placement for patients A.T. and V.F., and an additional angioplasty for patient T.B.

91.    Nurse Wills did not indicate that that Dr. Qamar performed these procedures. This in itself is very suspect because there should not be such a variance in dictations written by a doctor and a registered nurse describing the *same* medical encounter with a patient.

92.    While it does not appear likely that Dr. Qamar performed these procedures, a cardiologist would have to review the three patients films to conclusively determine whether such procedures were performed.

93.    The cath lab procedures performed on patients A.T. (private insurance), T.B. (private insurance) and V.F. (Medicare) were subsequently billed to the insurance companies based on Dr. Qamar's more expensive dictations.

(ii)    **Other Evidence of Upcoding**

94.    Taylor reviewed dictations that billed post-procedure groin checks as "Level 3" checks when the patient's records documented that such a check was not necessary. Similarly,

17

Dr. Qamar would bill for Level 2-3 E/M visits in conjunction with Coumadin checks (relating to the ability of a patient's blood to clot) when such a high level was not supported by the documentation or medically necessary.

95.     Taylor believes that, in these instances, Dr. Qamar or his Advanced Registered Nurse Practitioner (ARNP) billed for E/M when they were not indicated with routine Coumadin checks.

### (iii)    Billing But Not Performing Professional Ultrasound Interpretations

96.     Dr. Qamar was billing each day, on average, 25 professional ultrasound interpretations. Each professional interpretations takes approximately 10 minutes. Based on all of the other services that Dr. Qamar was billing each day, it would be impossible for him to perform 25 professional ultrasound interpretations each day.

## VII.   DAMAGES

97.     Each of the claims submitted to the Government Programs as a result of Dr. Qamar and ICE's routine waiver of copayments and payments on deductibles were false within the meaning of the FCA.

98.     Each of the claims submitted to the Government Programs as a result of Dr. Qamar and ICE's billing for medically unnecessary services were false within the meaning of the FCA.

99.     Each of the claims submitted to the Government Programs as a result of Dr. Qamar and ICE's billing for upcoded services or for services that were never provided were false within the meaning of the FCA.

100.    Dr. Qamar and ICE are therefore liable to the United States of America and the State of Michigan for millions of dollars in damages.

## Count I
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(1))

101.    Taylor incorporates by reference the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

102.    Dr. Qamar and ICE knowingly presented and caused to be presented to the United States of America false or fraudulent claims for payment in violation of 31 U.S.C. § 3729(a)(1).

103.    Taylor cannot at this time identify each and every such false claim, because there are hundreds, possibly thousands, of such claims that were presented and caused to be presented by Dr. Qamar and ICE over an extended period of time, and Taylor has no control over Dr. Qamar and ICE and has no access to the records in the possession of Dr. Qamar and ICE.

104.    By reason of the false and fraudulent claims submitted by Dr. Qamar and ICE, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each claim.

## Count II
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(2))

105.    Taylor incorporates by reference the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

106.    Dr. Qamar and ICE knowingly made, used, or caused to be made or used, false or fraudulent records or statements material to the payment of false or fraudulent claims, thereby causing false or fraudulent claims for payment to actually be paid or approved, in violation of 31 U.S.C. § 3729(a)(2).

107.    Taylor cannot at this time identify each and every such false statement, because there are hundreds, possibly thousands, of such statements that were presented and caused to be presented by Dr. Qamar and ICE over an extended period of time, and Taylor has no control over Dr. Qamar and ICE, and no access to the records in the possession of Dr. Qamar and ICE.

108.    By reason of these false and fraudulent statements made and caused to be made by Dr. Qamar and ICE, the United States of America has been damaged in a substantial amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each statement.

## Count III
### (Violation of False Claims Act, 31 U.S.C. § 3729(a)(3))

109.    Taylor incorporates by reference the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

110.    Dr. Qamar and ICE conspired to commit acts in violation of 31 U.S.C. §§ 3729(a)(1) & (a)(2).

111.    By reason of the false and fraudulent claims which Dr. Qamar and ICE conspired to have paid, the United States of America has been damaged in an amount to be determined at trial, and is entitled to recover treble damages plus a civil monetary penalty for each claim.

## Count IV
### (Violation of Florida False Claims Act, Fla. Stat. §§ 68.082(2)(a))

112.    Taylor incorporates by reference the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

113.    Dr. Qamar and ICE knowingly presented or caused to be presented a false claim for payment or approval for Medicaid benefits in violation of Fla. Stat. §§ 68.082(2)(a).

114.    The State of Florida, unaware of the falsity of the claims and/or statements made by Dr. Qamar and ICE, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay for services provided by Dr. Qamar and ICE.

115.    As a result of Dr. Qamar and ICE's actions, the State of Florida has been damaged in an amount to be determined at trial, and is entitled to recover damages and a civil monetary penalty for each claim.

**Count V**
**(Violation of Florida False Claims Act, Fla. Stat. §§ 68.082(2)(b))**

116.    Taylor incorporates by reference the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

117.    Dr. Qamar and ICE knowingly made, used, or caused to be made or used, a false record or statement material to a false or fraudulent claim for Medicaid benefits in violation of Fla. Stat. §§ 68.082(2)(b).

118.    The State of Florida, unaware of the falsity of the claims and/or statements made by Dr. Qamar and ICE, and in reliance upon the accuracy of these claims and/or statements, paid, and may continue to pay for services provided by Dr. Qamar and ICE.

119.    As a result of Dr. Qamar and ICE's actions, the State of Florida has been damaged in an amount to be determined at trial, and is entitled to recover damages and a civil monetary penalty for each claim.

**Count VI**
**(Violation of Florida False Claims Act, Fla. Stat. §§ 68.082(2)(c))**

120.    Taylor incorporates by reference the preceding paragraphs of this Complaint as if fully set forth in this paragraph.

121.    Dr. Qamar and ICE conspired to commit acts in violation of Fla. Stat. §§ 68.082(2).

122.    As a result of Dr. Qamar and ICE's actions, the State of Florida has been damaged in an amount to be determined at trial, and is entitled to recover damages and a civil monetary penalty for each claim.

**XIII.   PRAYER FOR RELIEF**

123.    For the foregoing reasons, Taylor respectfully requests that judgment be entered in favor of the United States of America and the State of Florida and against Dr. Qamar and ICE

21

for treble the damages to the United States and the State of Florida, in an amount to be determined at trial, the maximum statutory penalty for each false claim submitted and caused to be submitted in violation of the FCA and Florida FCA, an award of costs, and any other relief the Court deems proper.

### JURY TRIAL DEMAND

Taylor demands a trial by jury of all issues so triable.

Dated: June 13, 2014

THE NOBO LAW GROUP, P.A.

Rafael Nobo; Trial Counsel
Florida Bar Number: 0808091
19160 SW 29th Court
Miramar, Florida 33029
Telephone : (407) 803-3646
E-mail: rafael.nobo@gmail.com

QUINN EMANUEL URQUHART & SULLIVAN, LLP
Sam S. Sheldon
Ben A. O'Neil
777 6th Street NW, 11th Floor
Washington DC 20001
Telephone: (202) 538-8000

John S. Didday
50 California Street, 22nd Floor
San Francisco, CA 94111
Telephone: (415) 875-6317

ATTORNEYS FOR HOLLY TAYLOR